General Prelogar. Mr. Chief Justice, and may it please the Court, the Fifth Circuit's decision in this case is the first time any Court in our nation's history has held that Congress violated the Appropriations Clause by enacting a statute providing funding. This Court should uphold the CFPB's funding statute because it is the first time in our nation's history that Congress has violated the appropriations clause by enacting a statute providing funding. Because it is firmly grounded in constitutional text and in historical practice dating back to the founding. The text of the Constitution shows that when the framers wanted to limit Congress's appropriations authority, they did so expressly. And while the framers restricted appropriations for the Army to two years, they applied no similar limits on appropriations for any other agency. History confirms that point. Since the founding, Congress has consistently funded agencies through standing appropriations that are not time-limited and that provide significant discretion over how much to spend. The first Congress did exactly this with the very first agency it created, the Customs Service. And the same is true for other founding-era agencies, including the Post Office, the National Mint, the Patent Office, Revenue Officers, and the National Bank. And Congress has used this kind of appropriation as the default when funding financial regulators, including the Federal Reserve Board, the Office of the Comptroller of the Currency, the Federal Deposit Insurance Corporation, the National Credit Union Administration, the Farm Credit Administration, and the Federal Housing Finance Agency. The CFPB's appropriations fit squarely within this unbroken line of historical practice. In fact, Congress exercised significantly more discretion and control over the Bureau's funding by capping its annual appropriation in an amount that is far lower than many other agencies' budgets. Respondents argue that the combination of features in the CFPB statute violates some previously unrecognized constitutional line. But the Bureau's appropriation is materially identical to the numerous funding statutes I just listed, and respondents concede those statutes are constitutional. This Court should reject respondents' attempt to gerrymander a rule to fit the CFPB alone without providing a coherent theory about how to interpret and apply the appropriations clause. I welcome the Court's questions. General, other than passing an appropriations law, are there any limits on what Congress can do? So I think at the outset, as your question touches on, Justice Thomas, the term appropriation itself contains some essential requirements. So that term is defined to mean a law that provides for funding and that specifies both the source and the purpose of the funding. That's how an appropriation was defined at the founding, it's how it's always been understood, and that's still how it's defined today in sources like the GAO Red Book, which is Congress' own appropriations treaty. So we think that at the outset, it's not just any old law, but a law that contains those features that constitutes an appropriation. And then I think the question becomes, are there other limits out there on how Congress can structure funding for particular type of activities or government functions? We know, obviously, from the Army Appropriations Clause that the answer is yes with respect to that particular government function. There's a durational limit, and it's based on the nature of the activity because the framers were specifically concerned about having a standing army. But I think the Army Appropriations Clause itself demonstrates that there are not otherwise constraints in the Appropriations Clause that would limit Congress and how it decides to structure the funding. So beyond the initial almost skeletal requirements, duration, and purpose, there isn't, if I hear you right, there is no other condition? We don't think that the Appropriations Clause places those limits on Congress itself when it enacts a funding statute. But I do want to emphasize that our argument here also relies heavily on history. And so if you have in mind some kind of funding statute or arrangement that's never been done in all of this nation's history, I think the court could take that into account in a future case. Here, though, we have a specific type of appropriation, a capped, lump sum appropriation that's standing for a single agency. And our historical argument is that this is nothing new or unprecedented. All of the agencies I previously listed had similar appropriations. Is there any role that appropriations plays in the separation of powers? It seems that, at least when I was in the executive branch, that Congress exercised appropriation to check the executive branch to some extent. If there is, in this case, what would be in the case of CFPB, how would that play out? So I do agree and think that, of course, it's a critical element of the separation of powers that Congress has control over the purse. Our argument here is that Congress has exercised that power. This court, of course, is looking at a statute that Congress itself enacted that set up this funding mechanism for the CFPB, which is similar in kind to the way that Congress has funded other financial regulatory agencies. You don't think this kind of eviscerates the kind of exacting control that Congress usually exercises in the appropriations process? I don't. And, you know, to the extent that this question is pressing on the annual appropriations as a kind of counterpart here, I think that the question becomes, does the Constitution limit Congress with respect to the duration of appropriations? Is there some kind of implicit limit in the text that the court can define that means that Congress, in contrast to other laws, which, of course, can remain in effect until a future Congress acts, is Congress limited in how long to leave appropriations in effect? And there I think the Army Appropriations Clause does a lot of work, because it's not like the framers weren't aware of this dynamic. They thought specifically about the fact that appropriations, like all other laws, might be continuing indefinite until a future Congress acts, and they were concerned about that with respect to a standing Army, but they didn't otherwise seek to limit Congress's authority. General, one of the things that struck me as I was reading it, you have a very aggressive view of Congress's authority under the Appropriations Clause. I'm not saying remotely that that's not correct, but it struck me, you represent the executive branch as well, and it's a very strong power given to Congress, and it struck me that the reason you would want to defend that is because it gives them more power to give away. And obviously, legend has it, there have been times when the same party controlled both houses of Congress and the White House, and in that situation, you can see Congress empowering the President in a way that might seem unusual to the framers. So, keeping in mind that imbalance, in other words, it's kind of paradoxical, the more power you give Congress, I think the more, and this is, I think, your friend's argument on the other side, there's more that it can give away and enhance the authority of the executive. Is that an unpersuasive concern? Well, certainly I don't think it's an unpersuasive concern, but built into your question, as I understood it, Mr. Chief Justice, was the idea that maybe Congress could do something that would be surprising or anomalous to the framers. And I guess what I would say is that if you're looking at it through that lens, then history should play a powerful role in trying to understand the limits or scope of how much Congress can give away, when does it become too much. And here, the Court doesn't need to articulate any outer limits, because we have a very specific type of appropriation that's actually far more constrained than many that Congress has enacted throughout history, because Congress provided funding for a single agency and actually capped that amount of funding in an amount not to exceed the cap set by Congress. Well, it's pretty unusual to have that agency drawing its being able to request however much it wants, subject to a limit that it really hasn't gotten very close to over the years, from an entity that is also drawing the money from the private sector. I didn't see any particularly compelling historical analogs to that. And again, to the extent that takes you away from the appropriations power, it significantly enhances the power of the executive. So I disagree that there is anything unprecedented about this funding arrangement when you look at the relevant constitutional value of protecting Congress's prerogatives. And I know that there are a lot of different moving parts and pieces to the arguments respondents have made, but as I understand it, they are attacking four features of the funding statute. The fact that it's a standing appropriation, so it remains in place and is not time-limited. That it gives the director of the CFPB some discretion to act within the statutory cap in requesting the funding. Third, that the CFPB has enforcement and regulatory functions. And fourth, as your question touched on, that the CFPB's funding comes from a source that's not, in their words, constrained by market forces. But we have numerous examples of agencies that have all four of those relevant characteristics. I disputed at the outset that we don't actually think the functions or the market forces constrained are relevant. But even taking the argument on its own terms, I can give you founding era examples. The Customs Service and the Revenue Officers were funded with that kind of mechanism. They had standing appropriations for the Customs Service. It was uncapped. These were powerful regulatory entities. The Customs Service could board ships and seize vessels and inspect records and conduct searches and levy penalties and collect fines. And there was no way to avoid that kind of regulation. So the market constraint theory that the users could just opt out or regulated parties could decide not to fund the operations doesn't apply to those agencies. And it's still the case with many of the financial regulators today. The ones I would put on that list are the Federal Reserve Board, the FDIC, the NCUA, the Farm Credit Administration, and the FHFA. General? I'm sorry to interrupt. I just want to understand, following up on the Chief Justice's question, what role does the upper limit play on your theory of the case? Is that an essential feature to the constitutionality of this provision, or could Congress pass the same law with no upper limit, allowing the executive branch to determine however much it wished to take? So we don't think that Congress would have to provide a statutory specified amount, but they would, of course, have to specify the purpose of the funding. Okay, but just on the amount, your theory doesn't turn on there being an upper limit. Our theory doesn't turn on it because it's a wealth of historical evidence. So the President could take a trillion dollars if he wished to do so. No, because I think that Congress itself has specified that the director is limited to the amount that's reasonably necessary to carry out a federal consumer financial law. Sure, but if the President determined it was reasonably necessary to take a trillion dollars, that would satisfy your concern, and the Appropriations Clause itself has no upper limit constraint. I think that that would violate the statute, and the same theoretical possibility exists with all of the other financial regulators I've been discussing. But if you disagree, Justice Gorsuch, of course, here we have nothing like that. I'm just trying to understand your theory. That's all I'm trying to do. Yeah, so our theory is rooted in history, and Congress has appropriated in this way without a cap for time immemorial from 1789 on. How about on the lower end of the scale? What if the President decided zero was the appropriate sum? I'm not going to take any money. I don't like the CFPB. I don't think it's reasonably necessary to take another dollar. Could the President do that? So I think that would violate the statute as well at that point. I'm talking about the Appropriations Clause. So I think that Congress itself has specified the purpose, and so I think that if the President or the CFPB Director didn't comply with the statute, that would be a violation, and I would expect Congress to step in and change the funding mechanism. But all of these theoretical possibilities exist with respect to countless other appropriations. All of the other financial regulators, for example, likewise. I understand the practical realities, and I appreciate them, and I understand the statutory arguments. I'm just trying to understand the Appropriations Clause theory. Is there anything that would prohibit the President from the Appropriations Clause from deciding whether to take zero dollars, and we've already established he could take a trillion? I don't think the Appropriations Clause would be a check there, although of course Congress could then exercise its authority and its power over the purse to change the discretion that's provided to require the President or the Director of the agency to take a particular amount. General, can I ask you a question about the Treasury? So the professors of constitutional law and history say, listen, the Appropriations Clause doesn't even apply here at all because these funds aren't being drawn from the Treasury. Do you agree with that argument? It's not the argument that you made. We are not making that argument. We accept that the Appropriations Clause applies here. The reason for that is we understand the term in the Constitution to refer to the public treasury as a general matter, not specifically to the Treasury Department. Of course at the time of the founding ratification, the Treasury Department hadn't even been created, and that's also how this court has described the scope of the Appropriations Clause in cases like OPM versus Richmond, where it referred to public monies generally. And of course the contrary approach would expose a gaping loophole in Congress's authority here because it would mean the executive, if it has funds that aren't held in the general treasury, could spend even without Congress appropriating it or providing that authority in the first place. Are the monies in the CFPB's budget appropriated monies? So for constitutional purposes, yes, because Congress established the funding statute and it specified both the source and the funding. So within the meaning of the Constitution, this counts as an appropriation. That's how OPM and the executive branch and GAO and Congress understand the source of the funding here. What do we make of the provision in the Dodd-Frank Act which says that the Bureau of Funds, quote, shall not be construed to be government funds or appropriated monies? So that was Congress trying to control for the interaction between this funding mechanism and other background rules that apply to appropriations that go through the annual appropriation process. There are rules out there about things like procurement and whether you can use appropriated monies in that sense for litigation expenses. The miscellaneous receipt statute requires agencies to deposit their revenues in the general treasury. And some of these background rules would actually interfere with the funding that Congress intended for this agency. So I think it was just trying to control for the interaction there. So it was wrong. That statement is incorrect. In the Dodd-Frank Act itself, it's incorrect. These are appropriated monies. Well, I don't think that that statutory provision was taking a stance on the constitutional question of whether this fits the definition of an appropriation within the meaning of the Constitution. And as I mentioned, Congress has used this formulation for other agencies as well like the OCC and the FCA. And I think, again, it's all intended to just allow Congress to control for the interaction of various statutory provisions in this context. Does it use it for the post office and for the Mint and for other agencies of that nature? So, Justice Sotomayor, I'm not familiar with whether this particular language appears in the statutes governing the post office. You know, the post office, of course, was originally created and funded in 1792. And so it's not clear that some of these other background rules existed. But certainly we can point to examples today, including the OCC and the FCA, which have this same language. And I think it's meant to ensure, again, that there's no disruption with the funding operating in the way that Congress has. Could I go back to Justice Thomas's question? There appears to be, I'm sorry, I'm a bit congested. There appears to be wound up in this question of the Appropriations Bill, the separation of powers, and non-delegation. Now, I know the court below said non-delegation was forfeited. I'm not quite sure I understand, and maybe you could explain it to me, how separation of power is different from non-delegation. So if one was forfeited, why wasn't the other? But do you see those two other provisions, separation of power and non-delegation, as having a place in other constitutional provisions besides the Appropriations Clause? And if it has no place here, why not? Yes. So I think that, obviously, these concepts of separation of powers and the scope of the Appropriations Clause and non-delegation principles have, in many respects, potentially overlapping functions in this context. We understood respondents to be making an argument about the Appropriations Clause in particular, and the Fifth Circuit found that they hadn't separately raised a non-delegation challenge. You know, I guess what I would say is that to the extent the court is thinking about this from the perspective of general separation of powers principles, the things that the court generally consults in understanding these structural provisions of the Constitution are, first, the text, and, second, the history. Those indicators of intent here are overwhelmingly on our side. And then if the court is thinking about it from delegation principles, I think there, too, you would have to look at history. And as Justice Scalia emphasized in his concurring opinion in Clinton v. City of New York, if you look across the course of history from 1789 on, it has been in the appropriations context marked by very broad delegations of authority to the executive branch to spend within the bounds set by Congress. And the very first appropriations laws were structured like this one in the sense of providing that the executive could spend up to a cap that was set by Congress itself. So I think that, you know, the cleanest way to think about the arguments respondents are presenting is under the Appropriations Clause. But I recognize that as the court is thinking more broadly about these issues, the other doctrines could come into play. General, could I take you back to the line of questioning that you and Justice Gorsuch were talking about? In your reply brief on page 18, you discuss a standing appropriation of up to a quadrillion dollars for the president to fund as he deems fit the entire federal government besides the Army. So just on this question of where your outer limits are and what theory we might use to say there are some limits, what do you want to say about that sort of statute? Would that be a constitutional violation? If so, why so, and why is that different from this? Yes, so that statute, as we understand it, would be completely unprecedented. It would effectively take the whole of Congress's appropriations authority and transfer it to the executive branch. Congress has never done that for the past 230 plus years, and it's hard for me to imagine Congress ever would do that. But I think if the court were confronted with that issue in a future case, it could well recognize limits, and the limits would come from history. The court in any number of separation of powers cases has said that the fact that a method of structuring government has no historical precedent can strongly counsel against recognizing it as a constitutional way to proceed. That was the analysis the court said in Free Enterprise Fund. It repeated it in FILA law. But that history works both ways. The court has likewise said that the fact that a way of structuring government is well rooted in history and traces back to the founding is powerful evidence of the contemporaneous understanding of original intent. And that's the box we're in here. So I guess I would urge the court to save for another day whether there's some theoretical possibility that Congress could go too far with the kind of appropriation we've never seen before, and instead focus on this particular appropriations law, which we think finds its roots both in text and history. Well, I have the same question basically that Justice Kagan just asked you. Your response in your reply brief was an answer to an argument that was made by the respondents on page 24 of their brief where they say, If the Bureau is correct that there is no constitutional limit on Congress's power to pass laws providing funding to agencies, then a single Congress could allocate each year forever up to a trillion dollars to an agency like the FBI or FTC, or even up to a quadrillion dollars for the President to fund as he deems fit the entire federal government besides the Army. Now you answered the latter part of that in your reply brief about the quadrillion dollars, and you just answered that in response to Justice Kagan. You didn't answer the first part of that about providing a very substantial sum of money to an agency like the FBI or the FTC. I just want to understand what you think the limiting principle is. Let's take the FTC, which I think had a budget of $430 million, so let's say there's a law that allocates forever up to $1 billion adjusted for inflation to the FTC to use as the FTC seems fit. Would that be consistent with the appropriations clause? So I think at the outset, if the law said however the FTC deems fit, it's not clear that would count as an appropriation because it's not clear Congress would have specified the purpose. But I recognize you can tweak it and say, you know, to carry out the FTC's functions. In that context, I think the hypothetical would effectively be a standing uncapped appropriation because, of course, the FTC would never reach that amount. It would be for a single agency, and we think that that is well-grounded in history and in fact is how many agencies are funded today, particularly in the financial regulatory space. But if you have concerns about that principle, here, of course, we have the statutory cap. And respondents say, you know, the cap is illusory, that it's more like the hypotheticals we've just been touching on. But I don't see how they can tentatively make that argument when the cap is set at $600 million adjusted only for inflation and many of the agencies from which the CFPB inherited its responsibilities have far larger budgets, $1.8 billion for the OCC, around $1 billion for the Federal Reserve Board, over $1 billion for the FDIC. This is a meaningful restraint, and I think it just demonstrates that if the court thinks it's important to have that constraint here, the CFPB is even more under Congress's control than these other agencies. Excuse me. I'll ask one follow-up question on that. So I understand your answer to these hypotheticals is that we must look to Congress's historical practices. This is a matter of seeing whether the setup that we have before us is consistent with Congress's historical practices. Is that right? We draw heavily on historical practices, also text, of course. I don't want to lose sight of that. Is that the test? Is it the test? I think that the test in this context, as in most separation of powers cases, is yes, text and history. And here again, we have a specific constitutional provision speaking to duration, speaking to particular types of functions, showing that the framers were concerned about funding the Army with a standing appropriation but didn't have that same concern or effort to restrict Congress's authority with respect to other functions. And then we have an unbroken line of history. There have been agencies funded this way for every year. Well, what is your single best example of an agency that has all of the features that the CFPB has that are cited by the respondents? What is your single best example of an agency with that combination of features? I think our best example historically is the Customs Service. The first Congress created the Customs Service in 1789. It gave the Customs Service a standing, uncapped source of funding from the revenues that the Customs Service collected through things including coercive law enforcement activity, things like levying fines, also from import duties, which could not be avoided if you wanted to engage in trade with the new nation. And the Customs Service was one of the most powerful agencies that was originally created because it was so important to have a stream of funding for the new republic. So I think that if you look through all of the factors that are challenging here, we have the Customs Service and others, the revenue officers, U.S. attorneys for a period of time were funded through conviction fees. What is your best example of an agency that draws its money from another agency that in turn does not get its money from a congressional appropriation in the normal sense of that term but gets it from the private sector? So I can't give you another example of a source that's precisely like that one, but I would dispute the premise that that could possibly be constitutionally relevant. This is a case about Congress's own prerogatives over the purse, its authority. And if Congress has given away too much of its authority by not providing for a durational limit or not providing or providing for too much discretion to the agency, then I don't see how it could possibly fix the problem that other fee-funded agencies directly collected their money from the entities they regulate. So I take it your answer is that you do not, that is not consistent with any historical practice, but you think that to the extent it is unprecedented, it is unprecedented in a way that is not relevant for present purposes. Is that your answer? Yes, primarily. I think it would be unprecedented in the way that you could say this is the only agency that has the acronym CFPB. That's obviously true also, but it doesn't track the constitutional value. But I also just want to make the factual point that I don't understand them to be saying it's significant that it's structured this way in the abstract. They say what it means is that there's not a check on the overall amount of funding the CFPB could get, and there is a check on those other agencies. And that's wrong as a descriptive matter. There is no similar check on the Federal Reserve Board, the FDIC, the NCUA, the FCA, or the FHA. All of the entities they regulate cannot enter their, or I'm sorry, exit their regulatory sphere just because they disagree with regulation. So there's an untenable distinction on the facts. Justice Thomas, anything further? Mr. Liddle? Just a couple more questions, possibly. I think you may have answered this indirectly, but I just want to be clear. Do you think that the reference to appropriations in the Constitution is equivalent to public money? Do you think appropriated funds are the same thing as, quote, unquote, public money? So I think that funds that Congress has given to an agency do qualify as public money, yes. What if Congress set up an agency with substantial power but provided no method for that agency to obtain money other than private donations? Would that be consistent with the appropriations clause? I think that likely would be consistent. You know, that obviously speaks to the question of source, and I think that Congress has chosen different sources over time. But I don't think there's anything in the text of the Constitution that limits Congress's ability to try to determine the ways it wants to structure those kinds of funding mechanisms. So suppose Congress said, there are a lot of outside entities that have a great interest in the work of the SEC, so we don't think we need to appropriate any money for the SEC. The SEC can simply rely on private donations and build up its own endowment, so to speak. Would that be constitutional? I think that it likely would qualify as constitutional. Of course, if that created some kind of regulatory capture, I would expect that Congress would act to fix that. But, you know, there are examples throughout our history of scholarship funds, for example, that are administered by the federal government, originally funded by an endowment, and those, I think, qualify as appropriations. Thank you. Justice Sotomayor? General, it might be a good sign for a bad sign. I don't know. Nobody's talked about remedy. Let me give you an opportunity to summarize your best argument why the court below erred in its broad remedy of striking down, basically, not just this payday lending rule, but basically saying anything this agency's done since the beginning is invalid. So can you tell us how you deal with that? Yes. The Fifth Circuit here recognized a sweeping retrospective remedy that we think conflicts with both severability principles and traditional remedial equitable principles in this space. Just first on severability, Dodd-Frank itself has an express severability clause. This court emphasized that point in SELA law. And here the Fifth Circuit didn't even stop to consider whether any aspect of the CFPB's funding mechanism could be severed or would provide a basis to therefore limit the damage to Congress's work in trying to get this agency funded. I think that was error and that there are several candidates for severability that would be a much less disruptive remedy in this context and would not entitle respondents to any relief because the payday lending rule they challenge isn't traceable to those features or aspects of the funding mechanism. But even if you followed the Fifth Circuit's approach and thought that there was something about this entire funding mechanism that's invalid, even then I don't think a retrospective remedy is warranted. The court would be riding on a blank slate because no court had previously found that Congress itself violated the appropriations clause. But under traditional remedial equitable principles, it's necessary to take into account the public interest and the balance of the equities. And here a prospective remedy, which would prevent the CFPB from enforcing this rule against respondents until it has a valid appropriation, would give them a meaningful form of relief. And instead, the retrospective remedy that the court adopted is sweeping in implications and would be profoundly disruptive. I would point in particular to the amicus brief that was filed by the Mortgage Bankers Association that explains how many entities in various industries have critically relied on the CFPB's regulations, including in particular in the housing finance space. These create safe harbors for lenders so that they will be deemed to be in compliance with statutory requirements on things like ability to pay and on disclosure requirements. And if the Fifth Circuit is right and there's the prospect that all of these actions should be unwound, it would create profound disruption in various economic markets that would hurt the regulated entities themselves. So we think that that provides powerful reason to reject that kind of retrospective relief and instead have a going-forward prospective remedy only. Thank you. Justice Kagan? General, both Mr. Francisco and I think one of Justice Alito's questions suggests that, well, you might have the ability to say that each one of these features has a historical precedent, but that there is something special about the combination of all of them and that you can't point to a historical precedent which has every single feature that this scheme has. And you said to Justice Alito that the Customs Department comes awfully close, but I want you to step back a little bit and just talk to me about, you know, how should we be thinking about that question? Is it more important that all the parts have been used, or is it more important that the entire thing has an exact precedent? Is part of the lesson of history here that there's been enormous variation in the kinds of appropriations that Congress has made? How should we think about that feature of our history? Take it away. So I think it is absolutely correct to say that there has been enormous variation in how Congress has exercised its appropriations power over the course of history. Obviously, with respect to each of these challenged features, we think we have a wealth of evidence regarding standing appropriations or appropriations up to a particular cap. But I don't want to lose sight of the fact that if the court were to approach this issue looking at the combination of features, this is not novel. And I want to try to unpack a little bit why that's so, because Justice Alito had asked me a couple of questions about the source of the funding and in particular about the idea that maybe the line that got crossed here or the relevant difference in how the CFPB is funded is because it draws its funds from the Federal Reserve Board. And I think the reason why that doesn't work and why it shows that this is not unprecedented is that the whole theory behind that premise is that that's a constraint on other agencies. Market forces will limit the overall pot of funding the other agencies have. But that's not accurate as a descriptive matter with respect to things like the Federal Reserve Board itself, which regulates and assesses money on the Federal Reserve Banks required to stay in the system. They can't leave. And if the overall value here is to determine does the agency have some limiting check on the overall amount of funds, the CFPB is far more constricted because it has a statutory cap actually imposed by Congress rather than regulated entities. And I think if the court is looking at all of the features together, maybe some things subtract out Congress a little bit, but the cap adds in Congress in a very powerful and major way that I think distinguishes this appropriation for purposes of congressional control. Thank you. Justice Gorsuch? Justice Kavanaugh? Just two clarifying questions about the limits of your argument. There's a discussion sometimes about permanent appropriations and forever appropriations. My understanding, but I want to make sure you agree, is that Congress could not entrench a funding scheme. In other words, Congress could not pass a law that says this is the funding scheme and no future Congress may alter this for 10 years or 100 years. That would be constitutionally problematic is my understanding. I want to make sure you agree with that. Yes, I absolutely share that understanding, Justice Kavanaugh. And I think what it shows is that it's incorrect to characterize standing appropriations as lasting forever. In fact, we've pointed to a number of examples where Congress has acted to change the standing appropriations, and the Customs Service is a great example on this one too. It was funded through a standing appropriation for the first 120 years of this nation's history. And then in 1912, Congress took it out of a standing appropriation and brought it into annual appropriations. Congress just did this again in the debt limit bill recently. It rescinded many standing appropriations that had been part of the American Rescue Plan and the Inflation Reduction Act. And I think it just demonstrates that there is always that additional check of a future Congress deciding that it wants to alter the work of a prior Congress. So Congress could change it tomorrow? Absolutely, Congress could change it tomorrow. And then if the statute here gave the Federal Reserve more than ministerial control, that the amount was in the control of the Federal Reserve to range from zero to the cap for what the CFPB would receive, would that change anything? I don't think that that would change the relevant constitutional analysis. You might think of that as functioning a little bit like an agency overseeing a sub-agency and making modifications to its budget. In either example, Congress still retains a direct line in deciding how much funding should go to that sub-agency. And if it wants to change anything, there's no kind of double layer of insulation. But even if the court thought that maybe having that kind of more than ministerial process would create some kind of novel constitutional question, of course here it's important to emphasize that the Federal Reserve Board just has this ministerial role and it doesn't exercise any supervision. Thank you. Justice Barrett? Justice Jackson? Good morning, General. So I'm concerned that there might be a burden shifting happening in the way in which we're thinking about this, and so maybe you can help me just to keep the right burdens in the right place. Some of the questions that have been asked this morning seem to be requiring you to establish whether or not Congress can do certain things. What if Congress delegated the authority to determine a trillion dollars worth of funding and how the agency was going to do it? What if Congress set it up in this way or that way, et cetera? But I sort of thought that the burden was on them to show that Congress can't set up the agency in this way. And the reason I think that is because of the language of the Appropriations Clause and the way in which it seems to give the legislature the prerogative of the purse. And here we have a statute in which the legislature has exercised that. So am I right that that's really all you need to say to win? I mean, you don't lose if you can't establish the limits in Congress's exercise of its authority, right? I think that's right, Justice Jackson, and I think it actually highlights an important aspect of this case. You know, this is a separation of powers case. We are here defending a statute that Congress provided to fund an executive branch agency, and respondents are coming in and asking the Article III courts to oversee and superintend Congress's own exercise of its prerogatives over the purse. So I think absolutely the burden is on them to show that that kind of judicial intervention and invalidation of the statute is warranted here. And when we get to them, I would assume that in determining what limits there are, you say they've raised certain concerns. They say, oh, it's a problem with duration, oh, it's a problem that the agency has this degree of discretion, that the agency has this amount of power, that the source is coming from private individuals, et cetera, et cetera. But I guess their burden would have to be to determine that those limits exist somewhere in the law. I mean, it's not just up to us to sort of say, geez, those things seem problematic. We would have to find a legal source, I would think, in order to agree with them that those limits are actually imposed on Congress's authority. That's right, and obviously there are a lot of different policy judgments that Congress can make in thinking about the right way to structure funding for different agencies. It's established a certain set of norms when it comes to financial regulators in particular, of which the CFPB is a part. And I think the relevant question here is not, is this a good way to structure an agency? Is that a good policy? Or even has it been done before? I mean, I appreciate all of your historical analysis and all of the things that you're saying and all of that may well be so, but I guess I don't understand, like, what if we found that it wasn't necessarily set up in this way? Does that on its own establish that Congress couldn't exercise its prerogative? I don't think it necessarily would, and especially it wouldn't if one of the points of novelty was something that had nothing to do with aggravating any potential separation of powers issue. And this relates back to what I was saying to Justice Alito, that maybe you can come up with distinctions, but they're not materially relevant to the question before the court. Instead, I think if there were truly some kind of unprecedented funding scheme, you'd have to ask how does it differ and why does that matter and its respondents' burden to establish those things. Thank you. Thank you, Counsel. Mr. Francisco? Mr. Chief Justice, and may it please the Court. This case is about checks and balances. One of Congress's most important checks on executive power is its power of the purse. That's why Alexander Hamilton said that the unification of sword and purse was the very definition of tyranny. This case reflects precisely that fear of unification. The government agrees that Congress couldn't just authorize the executive branch to spend whatever it wants, but that's effectively what Congress did here. Where it authorized the CFPB to spend whatever it deems reasonably necessary in perpetuity, subject only to a cap so high it's almost never relevant, all for the very purpose of making this the most independent agency in American history. If it can do that, then it can authorize the President to spend whatever he deems reasonably necessary as long as he doesn't exceed $10 trillion. And that would work a sea change in the separation of powers. The government makes two basic arguments in response. First, it argues that that hypothetical would be unprecedented. But the CFPB is also unprecedented. Congress has never authorized an agency to pick its own perpetual appropriation. And if it can do that for the CFPB, it can do it for every other agency, too. Second, the government points to founding-era fee-for-services agencies like the Post Office and their modern analogs. But none of those can demand whatever they want. Instead, they're limited to what they can collect from the people that they serve and regulate. That's why Congress rejected that model for the CFPB. They thought it made the agency too politically accountable. And if you jump the shark from those to this, then you have blessed a regime in which Congress can authorize the executive branch to spend whatever it wants to fund the entire government. In short, the court should hold the line where it stands. Otherwise, it will have countenanced the very unification of sword and purse that the Constitution was designed to prevent. I'm happy to answer your Honor's questions. Mr. Francisco, I think it would be helpful. This is an appropriations clause case. And you seem to suggest that there's a spillover into separation of powers issues, non-delegation issues, without telling us precisely how we run into that problem and what the constitutional problem is. So we need a finer point. I get your point that this is different, that it's unique, that it's odd, that they've never gone this far. But not having gone this far is not a constitutional problem. It may be a problem with analogs, but it doesn't prove your case. And I think we just need you to give us a finer point than we've had. Sure. At a bare minimum, the appropriations clause requires Congress to determine how much the government should be spending. That's the core element of an appropriation. That's why I think everybody agrees that Congress can't simply say to the president, spend whatever you want. But this is functionally no different when you're saying to an agency, spend whatever you want in perpetuity. As long as you don't exceed a number so high, it's almost never relevant. I think that's why this unique constellation of factors is so uniquely problematic. Mr. Francisco, I'm sorry, where do you get that from? So you said the definition is what now? I think the core element of an appropriation is that Congress has to, at a minimum, determine the amount that the government should be spending. A fixed amount? It can't do it by a cap? It has to be a fixed amount? Yes, Your Honor. I think it has to set the amount that it should be spending. It can leave some play in the joints, as it did in the founding era. Some's not exceeding statutes. Remember, those were annual appropriations. Okay, so where do you get that from? Your Honor, I think that's where I get it from. I think the text of the appropriations clause, I think that's the core element of an appropriation. I'm sorry, the word appropriation, like what in the text of the appropriations clause makes it so that the requirement is that the government has to fix the amount? Three things, Your Honor. Yes. The first is I think that it is inherent in what an appropriation is. It's got to be the authorization to spend an amount of money. Secondly, any spending has to be Where's the fixed amount part of that? Sure, Your Honor, and that's what I'm getting at. Secondly, any spending has to be in consequence of an appropriation. So it's got to be in consequence of Congress's judgment. If you simply delegate to the executive the authority to make that front-line determination, the spending isn't in consequence of Congress's determination. And the third does turn to history and purpose. The whole point of separating the sword from the purse is to protect individual liberty. If you allow Congress to essentially transfer its authority to pick the appropriation to the executive branch. But it's not a transfer. So what if I defined appropriation differently, all right? What if an appropriation is just the decision that you are going to, you know, that a particular government department can spend up to a certain amount of money, that they have the ability to use a certain amount of the public fist? What if that's my starting definition? Well, Your Honor, if that's your starting definition, then I think you've adopted a definition of appropriation that does in fact allow Congress to essentially let the president pick his own appropriation. But if that's the definition in the Constitution, then I'm not allowing anything. That's what the Constitution says. If you think that the Constitution allows Congress to essentially say to the executive, you pick the number, spend whatever you want forever, I would agree. I would lose this case. I happen to think. Your argument in the briefs, as I understood it, did have a lot of moving parts. And now this is a much clearer view of what the Appropriations Clause demands. And if you're saying it demands a specific number that with a little wiggle room the executive has to spend, is that the way I understood it? I mean, I do think that if you go back to founding era statutes, there's this constant sums not exceeding X for a particular purpose. And Justice Scalia and Clinton said the constitutionality of such appropriations has never seriously been questioned. So if that's really the core argument that you're making, not like there are these 22 different things that come together in this particular statute to create a unicorn, but, I mean, that seems a much more fundamental argument and one that has been decisively rejected by our history. Two responses, Your Honor. First, that's not the core of my argument. And secondly, I don't think it's been decisively rejected by history. I think the problem when you combine a delegation to the executive to pick his own appropriation in perpetuity subject to a number that's so high it's almost never been hit, the problem with that combination of factors is because it uniquely, essentially, gives away the appropriations power. If you can do that for one agency, you can do it for every agency, and then Congress can affect the executive. I mean, this is $600 million, and this is a rounding error in the federal budget, honestly, $600 million and says up to $600 million, I mean, you say, oh, it's impossible to meet it. I mean, at the CFPB, it's a pretty new agency, and presumably, its regulatory programs are going to develop over time. Congress thought $600 million was a pretty good number. Maybe that will prove to be too high, and Congress will cut it back. Maybe over time, the CFPB actually will hit $600 million because they'll create new programs. But anyway, $600 million, $400 million, the CFPB, there was a statement that the chief justice made in one of his year-end reports, talked about how great it was that we returned monies to the federal treasury because that meant that we weren't wasteful. So the CFPB is not being wasteful, and it's using what it should be using in its view and generously, you know, basically saying not the rest. What is so constitutionally? So a couple of things, Your Honor. First of all, respectively, I probably push back on the premise that the CFPB is being parsimonious. I think what they are doing is asking for large amounts and rolling over a good chunk of that into their endowment, but I'll put that to the side. When you look at the caps, I think you have to look at it both from the back end and the front end. On the back end, I think most of us seem to agree, and I think sort of the government agrees that there has to be some kind of upper limit. And if there is an upper limit, it's got to be meaningful. The fact that they've never actually hit that upper limit is pretty good evidence that it's not that meaningful a limit. But I think the other thing you have to look at is it from the front end. Maybe it's good evidence that the CFPB should be doing more. Well, Your Honor, that's when I think you also have to look at it from the front end. And from the front end, the question is, has Congress made a determination as to what the executive branch or the CFPB should be spending? And here it's delegated that judgment to the director. In a way, I think that the Gundy dissent illustrates the problems with this type of regime. Remember, the problem from the dissenter's perspective in Gundy was that under SORNA, the attorney general had the authority to set sex offender requirements anywhere between zero requirements on the one hand and a very real statutory maximum on the other, the requirements that applied to post-act offenders but otherwise gave him broad discretion between the polls.  Mr. Kucinich, is the standard, is it like an intelligible principle of money spent? I mean, I think we're all struggling to figure out then what's the standard that you would use, just assuming that you're right, that there has to be something more than the $600 million. How do you decide how much is too much or how specific is specific enough? So, Your Honor, I think that at the back end, it's difficult to come up with a hard and fast rule that's saying too much is too much, which is why I do think you need to look at it from the front end and ask, has Congress made a determination as to what the amount should be? Or has it delegated that fundamental determination to the executive branch? In doing that, don't we have to assume that that's what the Constitution requires of Congress? That's where I'm getting hung up. You keep saying Congress is delegating this authority, and we understand your argument with respect to it, but what if that's not the sort of content of the authority? What if Congress doesn't have to? Well, Your Honor, if that's your position, I don't think I can get your vote, but I think if you step back and you understand that the Appropriations Clause is meant to separate the power of the sword from the purse, then it has to be a starting point that Congress can't simply say to the executive, you know, you pick the amount. We're not going to pick it. You pick it, which is why I think when you look at this language, at a minimum, Congress has to pick the amount. I was hoping you might finish your answer to Justice Barrett. Sure, and with respect to Justice Barrett, with respect to your question, when it comes to delegation, I think it's particularly problematic with respect to the Appropriations Clause. Remember, the Appropriations Clause isn't in Section 8 of Article I. It's in Section 9 of Article I. So it is both a – it is not just a privilege of Congress. It's an obligation and a duty that Congress has to check the executive branch. And if it can simply transfer to the executive its duty to check the executive, you are unifying the sword and purse. So to the extent that there's any delegation allowed in the context of setting the amount of the appropriation, it's got to be a very narrow one. And that is a perfect explanation for the founding-era sums-not-exceeding statutes. Those were statutes where Congress, in an annual appropriation, fixed the amount that it thought that the government should be spending, based on Hamilton's detailed estimates, often down to the penny. They just simply recognized a margin of error. And if Congress got it wrong in one year, it could fix it in the next year. That is, again, why I think that this unique constellation of factors is so uniquely problematic. But you concede that standing appropriations aren't per se unconstitutional. So you're saying Congress could fix it in the next year. But how long before a standing appropriation becomes a problem? Sure, Your Honor. I would not concede that a long-term standing appropriation would be constitutional. I think non-delegation principles generally recognize some play in the joints. I actually think it would be problematic to simply delegate to the executive for one year to pick its own number within a broad band of discretion. But I don't have to defend that position because here we've got the entire opposite end of the spectrum. This is a perpetual delegation to pick your own number within a very broad range of discretion, even if you think that upper line is meaningful. The word perpetual I'm having trouble with because it implies that it's entrenched and that a future Congress couldn't change it. But Congress could change it tomorrow. There's nothing perpetual or permanent about this. So I think it's entrenched, Your Honor, in the sense that I think maybe the Chief Justice was referring to. Once Congress gives it over to the executive and expands executive power, you've now given a co-equal branch of government a large amount of your power, and you need to claw it back. You can't claw it back through an ordinary law. You can only claw it back through either convincing the president himself to give up presidential power, something you've given to him, which is tough to do, or you've got to override a presidential. Well, if a group of a member of our House of Congress tomorrow, if a majority of the House of Congress said we're not going to fund Pick Your Agency unless we change the CFPB funding structure, they could do that. Sure, Your Honor, they could do that. But nonetheless, once you give up power to another agency, you've suddenly flipped the baseline for getting it back. You do need to use those very powerful tools and ultimately override a presidential veto or convince the president to give up his own authority. I agree with you on flipping the baseline. I agree with you on that. But just the word perpetual or forever or permanent I think is a little strong here. Then on the independent point, you said Congress had created the most independent agency in American history. And I certainly agree that as originally constructed, the CFPB had, in my view, a massive constitutional flaw in the single director who was protected by four-clause removal. But that, of course, was fixed and addressed and sealed the law. And now it's not independent at all, at least as the term independent is used. It's under the direct supervision and control of the president. So I don't think it's – correct me if you think that's wrong, but it's not independent. They certainly fixed half the problem, but they didn't fix the other half of the problem in our view. Look, everybody knew what was going on in 2010. The 2010 Congress knew that there would come a time when future Congresses didn't look so favorably upon the CFPB. And they wanted to insulate a future CFPB from political pressure from a future Congress. And that's precisely why they adopted the funding regime that they adopted. But future Congresses are supposed to have the ability to check the president through a continuing power of the purse. It's meant to be a continuing check on executive power. And to come back to the fundamental problem of the transfer of that front-line determination to the executive branch, to the director, as far as this statute is concerned, I will even concede for the sake of argument that wide band is a meaningful one. Within that band, if the director picks $150 million or $600 million, it's perfectly fine from Congress's perspective because Congress simply said to the board, you make that determination. And that top-line number isn't even a real number because they can further evade it by building out this continuing endowment. It does seem to me that your argument is essentially that what the appropriations clause demands is annual line item appropriations. That that's not just the paradigm appropriation, but the only constitutionally valid kind of appropriations. And that any deviation from that needs some special justification or maybe is just like unconstitutional per se. I'm not exactly sure what the argument is. But the history of our country just rejects that scheme. I mean, that might have been a way to understand what the framers were doing. But it turns out that from the very first year, that's not what they were doing. That's not what they did. Annual line item appropriations were some appropriations, but massively not all appropriations. And so you're just flying in the face of 250 years of history. And respectfully, Your Honor, that's not my argument. I think that the lack of durational limits here is what makes this particularly problematic. But it's particularly problematic when you combine that with a delegation to an executive branch agency to pick its own appropriation subject only to a limit that's so high it's almost never relevant. If you can do that here, you can go agency by agency by agency and simply say spend whatever you think reasonably appropriate as long as you don't hit $10 billion. I'm sorry. I'm trying to understand your argument that I'm a total loss. I'll try to do better. Okay. I think I understand it the way Justice Kagan does, but you're telling me it's something different. From the very beginning, Congress gave sometimes a lump sum and said to an agency, you can spend this amount, but didn't do a line by line on what or how much. And the agency would decide how much of that sum it needed. Over 60% of the appropriations, I think it may be 73, 63, something like that, are outstanding appropriations. They're not given every year. And some of them are fixed and some of them are not. Some are, you know, whatever you need to run your agency, including from the very beginning in 1789, the Customs Service. So I don't understand what you're saying. So you're on a spectrum. Unless you're saying standing appropriations are wrong, tell me why they're wrong. If they're not wrong, tell me when they're right. Tell me how much detail they have to go into. And why is a cap different than a standing appropriation for a certain amount? Since we can't force anybody to spend as much money as you give. And routinely, lots of agencies return money, including this one, the court. So either, I don't know what you want. So the first thing, Your Honor, is I would like to address the Customs Service. Because my understanding of it is not the same as my friend's understanding of it. As I understood the Customs Service at the time of the founding, it was actually funded through fees that it collected as part of the collection of customs. And Congress set those formulas. Congress determined what fees they could collect or what formula they could use to collect those fees. And in addition, it was supervised by the Department of the Treasury, which was itself subject to annual appropriations. So I don't think it was a standing appropriation. Now, it was a standing appropriation between 1849 and 1912. There was a $1.5 million standing appropriation. But two things about that. It was still subject to the supervision of the Secretary of the Treasury. And that turned out not to be enough. They had to generally go back for regular appropriations. Now, that's at least how I understand the history of the Customs Service. In terms of what the standard is, I think our front-line rule is that a minimum Congress has to determine the amount. And the reason I'm focusing on the factors that I'm focusing on is because when you bring those factors together, you have really exploded any limitation at all. And I think it's enough to say that when you delegate to the executive the authority to pick its own number subject only to a cap that's so high it's rarely relevant. And if not perpetually, at least for a long period of time, you have uniquely brought together a set of factors that does allow Congress to essentially transfer its appropriations power to the executive branch for an indefinite period of time. And you just have to multiply that across the agencies to see why that's so dangerous. It sure seems that, on your view, the Federal Reserve would also be unconstitutional. Why or why not? No, Your Honor, for a couple of reasons. I think the main one is that, as this Court has suggested in SELA law, and as I think then-Judge Kavanaugh suggested on the D.C. Circuit, the Federal Reserve is pretty much sui generis. I think it reflects the fact that at the time of the founding, the core functions of the Fed, controlling the money supply through open market transactions, weren't really considered governmental functions at all. That's why— So there's also a governmental function component? Well, no, Your Honor, I mean, if it's not— Because you state a test, and then an agency that clearly fails under that test, you say, oh, no, I don't mean that. No, because for the Fed, remember, the first and second national banks were organized as private banks. To this day, the presidents of the private regional reserve banks sit on the Federal Open Markets Committee. And it's also why I think that if this Court were ever to take the step of overturning Humphrey's executor, it likely wouldn't impact the forecaused removal restrictions on the board itself. And I think it does reflect that historical tradition in the Fed of it not really exercising governmental powers. Yeah, it's just too important and whatever. I mean, the FDIC, the OCC, they also fail your test. No, the FDIC and the OCC, I think, are well within the tradition of agencies that are limited to what they can collect from the people that they serve and regulate. But I think my more important point, Your Honor, is if you think that— I mean, you're now adding a new thing to you. No, I'm not, Your Honor. What I'm saying is that if you think that those serve as the model for the CFPB, then it really is Katy bar the door. As my friend explained, those agencies don't even have a statutory cap. So if you think that that's what justifies the CFPB, then you truly could go agency by agency and simply say, spend whatever you want, full stop, period. We'll come back to you when we think we can override it. Mr. Francisco, until the very end of the Solicitor General's argument, I thought I understood the limiting principle that she was advocating and the limiting principle that you were advocating. And at least at a fairly high level of generality, I thought there was an agreement on what the limiting principle was, and that was a comparison of the setup that is before us with historical practice. And I don't think there's anything unusual about asking counsel in cases that come before us for the limiting principle of the argument that they're making. That's a basic question that we ask. I don't think it's a question of burden shifting. In any event, at the end of the Solicitor General's argument, she seems to be embracing a much broader argument that I think was posed by Justice Jackson's questions, and that is whether the appropriations clause is satisfied so long as Congress adopts any law that says, you agency, you get money in this way. So long as there's any law that does that, that's consistent with the appropriations clause. Now, the Solicitor General on rebuttal can clarify whether she thinks that's the correct test that we should apply or whether it's the one that I had previously thought she was advocating, which looks to whether something falls far outside Congress's historical practices. So could you comment on this broad any law argument and, in particular, answer the question whether the appropriations clause would have any meaning if that broad interpretation were adopted? Because that would simply allow the very first Congress to say to President Washington, Mr. President, spend whatever you think is reasonably appropriate. We'll come back sometime if we think you've got it totally wrong, and we can override your veto. So I think that cannot possibly be the test. The Constitution says no money shall be drawn from the Treasury, but in consequence of appropriations made by law. How money would be drawn from the Treasury without a law is something that baffles me. I think that's exactly right, Your Honor. In Cincinnati Soap, I had understood the point of the appropriations clause to prevent the executive and other circumstances from exercising the authority to take money without consent of the legislature. I had understood the work of the clause not to be to direct the legislature as to how to exercise its own prerogative of the purse, but instead to ensure to support the separation of powers concept by ensuring that the prerogative is lodged with the legislature and not with the executive or someone else. Am I wrong about that? Your Honor, respectfully, I think you are. I think it is both Congress's prerogative but also its obligation to check the power of the executive branch. That, after all, was the whole reason. No, but is there something about the appropriations clause that specifically directs Congress with respect to its own exercise of the appropriations power? Well, Your Honor, I don't think there's anything specifically in the word appropriation that necessarily answers it either way, which is why I think you do have to take a step back. But don't you have to have that in order to say that Congress is violating the appropriations clause by the way in which it exercised it here? I thought your answer would have to be that the appropriations language in the Constitution carries with it the limitations that you say have to be applied in the situation. It has to be fixed. The other aspects that you say are troubling would have to be derived from that constitutional provision, right? Not in terms of how this Court traditionally interprets these provisions when it comes to separation of powers. Look, as some members of the Court have pointed out, there's no removal clause in the Constitution. So where do we get them from? If they're not in the Constitution, where do we get them from? I don't understand. We can't just suddenly decide that things are troubling without some kind of legal reference point. Well, Your Honor, I think when it comes to separation of powers, it's inferred from the text and structure of the Constitution construed in light of its overriding purpose. But, Mr. Francisco, the removal clause comes from the vesting – I mean, the removal cases focus on the vesting clause in Article II. So there is a textual hook. One here, Your Honor, there is a textual hook as well in the Appropriations Clause, which, again, is set forth in Section 9 of Article I, which actually sets forth limitations and obligations upon Congress. Except the limit's not there. I mean, I guess that's what I'm struggling with, and I take it some of the other questions are, too. I mean, you have the unitary executive theory, right? You would say, well, if all executive power has to be in the President, then his ability to fire someone, his ability to remove someone can't be hindered. But here, you were just saying to Justice Jackson that there's nothing in the Appropriations Clause itself or in the word appropriations that imposes the limits that you're talking about. Now, what I'm saying is that the word appropriation is – you can interpret it in different ways. At its core, what the Appropriations Clause does, Congress has to make an appropriation. It's got to determine what the government should be spending. It's got to determine the amount that it should be spending. And it's got a non-delegation component baked into it because you cannot simply transfer that core legislative function to the executive branch. And that's why I think that even if you put the issue of a cap aside, even if you think that this is a meaningful band of discretion, it's an extraordinarily wide band of discretion that excuses – What if you said, like, four years, $400 million a year? Would that be a problem? If it were $400 million a year, I think that would be fine. If it said to the – $600 million would be fine. If it said to the – what I'm getting at is if Congress is fixing the right amount, the amount should be $400 million or the amount should be $600 million, that would be a much more difficult case for me. When Congress is doing what it did here, it's saying to the director, you pick the amount that you think is reasonably necessary. It could be zero. It could be $750 million. It's taking that core element of an appropriation, determining the amount that the government should be spending, and it's saying, we, Congress, are not going to exercise that judgment. We're kicking that over to you, the executive branch, to exercise that judgment. And that is what's so problematic and is what is so also historically unprecedented if we're going to use precedent as the test. The only counterexamples tend to be the self-funding agencies, the post office, the patent office, their modern-day analogs. Well, they don't get to pick their amount because they're different in a meaningful sense. They're limited to what they can collect from the people they regulate and serve. And there's a historical tradition for those types of agencies. But that history tells us a couple of other things, too. It's never been extended beyond that group of agencies. That model was rejected for the CFPB. That was actually the model that President Obama proposed for the CFPB. But Congress rejected it because it wanted to make this agency even more independent. And finally, if you do think that's the model, there really is no limit because those agencies don't even have a cap. So Congress could just say to every agency, spend whatever you think reasonably appropriate. You make the front-line judgment within this very broad range of discretion in something maybe not quite perpetual but close to it. Thank you, Counsel. Justice Thomas? Mr. Francisco, just briefly, I'd like you to complete this sentence. Funding of the CFPB violates the appropriations clause because? Because Congress has not determined the amount that this agency should be spending. Instead, it has delegated to the director the authority to pick his own appropriation subject only to an upper limit that's so high it's rarely meaningful. Justice Alito? Well, my concern is the limiting principle that both sides are advocating. And you just addressed your answer to Justice Thomas, and I remain confused about the government's limiting principle, whether it is adopting the argument that any law suffices or whether it requires us to look at historical examples and see whether there's anything that's at least roughly analogous to what is before us, whether what is before us goes far beyond anything that Congress has done in the past. I won't ask a question of the Solicitor General in rebuttal, but maybe she'll answer that question at that time. Justice O'Neill? I don't know how to take your answer because it's so open-ended. I don't know how much is too much. You know, are you going to say if it's not close to 30 percent, 40 percent, 50 percent of expenditures, 90 percent, are we going to have to apply this to every agency that returns money or underspends every year? I don't know. But can I get to remedy for a moment? Sure. All right. Tell me why basically saying every rule passed by this agency has to be struck down. Well, that's certainly not what we're saying, Your Honor. That's what the Fifth Circuit said. We have challenged one rule. We've asked for that one rule to be set aside. But I want you to tell me how the logic wouldn't apply to everything the agency has done, every rule, and how do we avoid the market disruption that the SG and the amici point to? Yeah, Your Honor, in a way, I don't think that this argument really stands on its own terms because if we're right, then this does have to go back to Congress for a valid appropriation. And when Congress adopts a valid appropriation, it can ratify whatever rules and regulations it wants to ratify. And if it doesn't ratify them, it pays a political price for that choice. Which part of the law or which part of this structure you would strike down? The funding provisions, the provision that— So should they say every—if they said something, every year, whatever you spend on salaries, office space, your legal functioning, your experts, whatever else, the Federal Reserve Board has to pay just that amount. Is that okay for you? Your Honor, have we moved off of remedy back on the merits? No, we're still on remedy. Is that still—because if we sever that, they can only ask for what they've spent? No, Your Honor, because it's not severable. You'd essentially have to—the only way to get to some alternative answer through severability is essentially pull out a white piece of paper and start on your own. There's no provision that you can simply excise. Some of my colleagues have accused us of rewriting laws when we do that. I'm not one of them, so follow my approach, which is, I think, for me, the appropriate one. Do the least harm, which is if we've got something unconstitutional, we don't throw away the baby with the bathwater. We try to figure out what the bathwater is. So tell me what the bathwater is and how do we limit the effect of what we're doing? To me, Your Honor, there is no bathwater here. There is no valid way to do a severability analysis that gets to something reasonable. The most that you could do is somehow rewrite this thing to come up with a standing appropriation of, say, $750 million adjusted for inflation in perpetuity. And return the excess to the Treasury. Why is that a bad thing? Sure, but for two reasons, Your Honor. One is, just as a technical matter, I just don't know how you can get there from the statute. So I think that would be far beyond anything the Court's ever done in the severability world. Two, Your Honor, you would be adopting a funding stream, a standing appropriation at an amount higher than this agency has never needed before. That's something that Congress has never done, as far as I know, never done. And so you would essentially, you know, the whole point of severability is to try to mirror legislative intent. Why on earth would you adopt a funding stream that Congress has never even considered before? Instead of just simply saying to Congress, it's now back in your court. You need to make a valid appropriation. And if you need to stay your judgment for a period of time, as you did in the Northern Pipeline case, to facilitate that, we certainly have no objection to that. But at the end of the day, this should be in Congress's court. Justice Kagan? I could take you back to your exchange with Justice Thomas. Do I understand that to mean that you think that what Congress would have to do to make this constitutional is to change this from a no more than $600 million to a $600 million, no more, no less? Well, Your Honor, if it were $600 million, no more, no less, my only remaining argument would be a challenge to its either perpetual nature or long duration. Well, then you're amending your answer to Justice Thomas. No, I'm not. That would be a much more difficult question. Could I just please ask my question? Because when you talked to Justice Thomas, you said that the because, what followed the because, was that it was an up to X rather than a specification of a number, no more, no less. So if that's right, then it must be right that Congress could take this back and say you have to spend $600 million and that would be constitutional. And what I would suggest to you is that's what your argument is, and that's profoundly ahistorical in terms of our history. So a couple of responses, Your Honor. And I don't want to quibble with the premise of the question, but I think that when I listed out my standard to Justice Thomas, one of the factors was the fact that this was perpetual. I'll put that entirely to the side. If Congress does make a standing appropriation of $600 million, at a bare minimum, it will have made a determination as to what the government should be spending. And so I would have a much harder time arguing against that alone. I don't think that that type of thing is historically precedented. Outside of the self-funding agencies like the Post Office and their modern analogs, I'm not aware of any agency that has been subjected to a standing appropriation for its operating budget, much less one that's been subject to that kind of standing appropriation in perpetuity at a number that's higher than they actually need. The closest I can think of throughout history is the Customs Service from 1849 to 1912, where they had a $1.5 million standing appropriation, but they were, one, subject to the supervision of the Secretary of the Treasury, who received regular appropriations, and two, that amount wasn't even enough, which is why it went back for regular appropriations. Thank you. Justice Gorsuch? Justice Kavanaugh? Justice Barrett? Justice Jackson? Yes. So I think I've heard you say repeatedly that the problem here is that Congress is giving away the power of the purse in the way that it has set this up. Is that your fundamental bottom-line problem with this? Yes. Okay. And I guess my answer is maybe that it depends on what the power of the purse is in order for us to know whether or not it's being given away. And so I'm thinking of these two separate scenarios, and maybe, I don't know if this is helpful, but I'd like to get your reaction. So in scenario number one, we have a constitution that gives the legislature the power of the purse, and it specifies what that authority entails. It says to exercise the power of the purse, you have to select a fixed sum of money on an annual basis and tell the recipient exactly how it must be spent. I think if that's our constitution, then I might well agree with you that this agency structure is giving up that power because, in fact, those determinations about how much is being spent and et cetera would be given to the agency, and the constitution tells us that the legislature has to exercise that authority. My problem is scenario two, which is the constitution giving the legislature the power of the purse, and it defines the power of the purse as the power to decide how government departments are funded, period. That's what the constitution says. It's got a definition section, and it says when we say power of the purse, we mean you have the ability to decide how the government is funded. If that's your constitutional provision, I think you have a harder time, if not almost an impossible time, convincing me at least that by setting this agency up this way, in which Congress has exercised that authority by deciding this is how the CFPB is going to be funded, that they have actually given up or, you know, ceded that authority or something. In fact, they've exercised it pursuant to my constitution. So I guess I see and I hear the government arguing that our current constitution is more like scenario two, and so therefore if that's true, don't you lose on this fundamental conception of you've given away your authority. Your Honor, if that were truly the conception embodied in the appropriations clause, then the answer to your question is yes. But if that is truly the conception, then there really are no limits on the appropriations power. But wait, why is that a problem? If that's the conception, that's what scenario two says. Sure, Your Honor. That the founders said we are trying to give to the legislature the authority to make the determination of how the government is funded. Period. And that's my point, Your Honor. If your conception is that Congress can say to the President, Mr. President, you spend what you think is reasonably appropriate, full stop, period. If you think that's what it means, then I lose. No, but I'm asking you to help me to understand why that's not what it means. That's your burden, right? That's what the words seem to say. There's nothing in this constitution that's like scenario one, like the army clause, where the framers have specifically restricted the exercise of authority that they're giving to Congress. So what I need to find out from you is why we are not in scenario two, given the language of this, the history of the way in which the appropriations clause has been handled. Why isn't this just up to Congress? And if they decide they want to set it up in this way without limit, so be it. Because, Your Honor, I think that that would be completely inconsistent with the entire purpose of separating the sword and purse, which Hamilton said if you were to combine the two would furnish one body with all the means of tyranny, which Madison said was the most complete and effectual weapon. But can I ask you why is that necessarily the case? Congress could, as Justice Kavanaugh keeps saying, take it back. Congress is getting reports in this situation about what's happening. So if Congress says for the foreseeable future what we would like to have happen is for this agency to get this amount of money and spend it on these general purposes, period, why is that risking the kind of tyranny that you suddenly seem to think is the issue here? Because what you're allowing Congress to do, as I understand your question, is to say to the President, Mr. President, it's no longer our determination, it's your determination. Whatever you want, whatever you think is reasonable, that is fine with us. I don't think anybody, even my friend on the other side, is defending that position. The Constitution is unconstitutional. Because in my hypothetical, the framers have said that in the Constitution. Congress, you can set this up however you want to include allowing an agency to make this determination. So that's unconstitutional. No, because I have conceded that if the Appropriations Clause actually means what you're suggesting it means, I'm wrong. I'm simply saying that it cannot possibly be what the Appropriations Clause means, because if it were, then the game is really over. One Congress can simply say to one President in one fell swoop, Mr. President, it's up to you. Spend whatever you want. And what Madison thought was so dangerous, what Hamilton thought was so dangerous, would actually be precisely what the Constitution allows. But, of course, that's not what's happening in this case, right? I mean, I think the solicitor's argument is maybe if we had anything close to that, the court would consider whether or not tyranny is afoot. But for this particular scenario, there are the kinds of checks that you would expect to see in terms of Congress's exercise of its power. Two points, Your Honor. One, structures don't crumble in a day. They crumble over time. And this would be the first very substantial step in the crumbling of that structure. Secondly, if you adopt the theory you're suggesting, then it's not really the second step for the crumbling of the structures. You've simply announced that the structures do not stand. Here, the fundamental issue is that Congress has to make a determination as to what the government should be spending. It cannot simply say, we're going to let the President do that, because if you transfer that to the- One final question, Mr. Francisco. I'm a little worried, I think, about the separation of powers problem that may occur if the judiciary gets involved with telling Congress when and under what circumstances it can exercise its own prerogatives concerning funding. How do we avoid the slippery slope of today you say the issues are duration and source and whatever. The next agency, someone's going to come up with a few more. How do we avoid the judiciary becoming suddenly a super legislator just telling the Congress agency by agency whether it's a thumbs up or thumbs down from our perspective about these things? Where are these limits in the law that prevents us from overstepping our authority? Sure, Your Honor, and the judiciary has always played a vital role in policing the separation of powers. Because the whole point is not to protect Congress from the President or the President from the Congress, it's to protect the liberty- Right, but where are the limits that we have in order to do that? We've got a police relative to some set of rules, and where are those coming from? And that's exactly what we've been talking about the whole time. Under the Appropriations Clause, Congress has to make the determination as to what the government should be spending. It cannot transfer that core legislative power to the executive branch. And the problem here is when you allow that transfer for a very, very long period of time subject to a limit so high you're almost never going to hit it. You've essentially created a blueprint for the total collapse of sword and purse, the very thing that the framers thought was necessary- Thank you. To protect liberty and a free society. Thank you, Counsel. General Prelogar, rebuttal. Thank you, Mr. Chief Justice. My friend said several times this morning that to make a valid appropriation, Congress needs to specifically fix the amount. That's inconsistent with how an appropriation was understood in the founding era. It was defined as the act of assigning something to a particular use. It required the specification of source and purpose, never a specific sum. And if there were any debate about that point, the 230-plus years of this nation's history conclusively resolved it. appropriated without specifying a fixed sum, the first act that it enacted that was an appropriation specified up to a particular cap of spending that was authorized. That's just how the CFPB's funding mechanism is structured today. And there have been countless appropriations that look like this throughout history. My friend's theory would have sweeping consequences. Even today, in the 2022 Consolidated Appropriations Act, we counted more than 400 uses of this kind of discretion to spend up to a specified cap. And Congress has regularly enacted appropriations that define the amount in terms of purpose, the funds necessary for social security or for the judgment fund or to pay interest on the national debt. That is not a historical outlier. It is the norm in appropriations law. My friend turns to suggesting that the cap here is illusory. At the outset, I haven't heard any standard that would be judicially manageable for courts to apply to try to make those judgments. This is, again, a case about Congress's power over the purse. It's chosen a number. It's enacted a cap. And I don't know what basis courts would have to say, that's too high, that's not a meaningful constraint, Congress should have set it lower. And I think that that is a real problem with their theory at the outset. But even if the court engaged with it, it's not factually accurate here to say this isn't a meaningful constraint. Congress, when it chose the $600 million figure, said that this was modest compared to other agencies' budgets. It was attempting to estimate the amount in the Federal Reserve System combined earnings that had been previously spent on consumer protection. And, in fact, if you look at the CFPB's funding requests over the years, it's come closer and closer to the cap. I think the most recent fiscal year, the CFPB was only $30 million below the cap. So if that trajectory continues, it's very likely the CFPB is going to have to go to Congress and ask for additional appropriations authority. My friend also suggested that there was something constitutionally suspicious about standing appropriations. But I didn't hear any engagement with the text of the Army Appropriations Clause. The framers thought about this issue. They did want to limit Congress when it came to funding for the Army to create that durational requirement. But they wrote no other limit into the Constitution. And this, too, would have sweeping consequences because today over 60% of the federal budget comes in the form of these kinds of standing appropriations that exist in every sector of the federal government. And then at some point, I think my friend had suggested that it's all of these features combined that add up to a constitutional problem here. And, Justice Alito, I want to engage with your question about the limits. Our theory in this case is based on text and history. So I acknowledge that if there were, in fact, a funding statute that didn't look anything like what we've had in all of history, and if the differences that you could ascertain are relevant to a potential separation of powers violation, that would count against us. And it would mean that maybe the court could determine that at some outer recess of the separation of powers, a line was crossed. But we have nothing like that here. We have an appropriation that in all material respects looks like countless others that have existed for time immemorial since 1789 on. And I think that leaves my friend suggesting that the court should turn away from text, the Army Appropriations Clause, and turn away from all that history and find some kind of implicit additional limit on Congress's authority here. But my friend hasn't offered a principle the court could apply to draw those limits. With respect to whether the funding is too much, how is a court supposed to figure it out? With respect to duration, my friend says that some appropriations can last longer than two years, and I think he has to make that concession because of the Army Appropriations Clause. But then how long is too long, and how is a court supposed to determine what functions don't count? He suggested that you can distinguish some of the other financial regulators, like the Federal Reserve Board, based on the particular functions that it carries out. But that's not a point of distinction either. The Federal Reserve Board regulates. It enforces. The other financial regulators do the same. And I would point the court to 12 U.S.C. Section 1818 to demonstrate that these functions are not different, nor is there any principled line here that the court could apply to try to ascertain and weigh the relative difference of function between different agencies, as the court observed in Collins v. Yellen most recently. And I think what all of this adds up to is that my friend is proposing that the court go down the road, for the first time ever, interpreting the Appropriations Clause to contain some kind of inherent, implicit limit on Congress that has never previously before been recognized and that is completely detached from history. We'd ask the court to reject that approach. Thank you, General. Mr. Francisco, the case is submitted.